UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

**FILED**

02 MAY 20 PM 4:1?

U.S. D . . . . . . COURT
**N.D. OF ALABAMA**

|  |  |
|---|---|
| MICHAEL WASHINGTON, by and<br>through his next friend, REGINA<br>GILYARD; REGINA<br>GILYARD, individually;<br>and ANTHONY PATTERSON,<br><br>Plaintiffs,<br><br>vs.<br><br>ALABAMA DEPARTMENT OF<br>HUMAN RESOURCES; BILL FULLER,<br>individually and in his official capacity as<br>COMMISSIONER OF ALABAMA<br>DEPARTMENT OF HUMAN<br>RESOURCES; MENDI JONES;<br>ALABAMA CHILDREN'S HEALTH<br>SYSTEMS, INC.; DR. ALAN SHIPP;[1]<br>and CHRISSY HOLMES,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Civil Action No. CV-01-S-1493-S

**ENTERED**

MAY 2 0 2002

## MEMORANDUM OPINION

Plaintiffs Regina Gilyard and Anthony Patterson are the mother and step-father, respectively, of plaintiff Michael Washington, a minor who sues by and through his mother.[2] All claims in this action arise from the fact that the minor plaintiff was removed from his home on October 17, 2000, by deputies of the Jefferson County, Alabama, Sheriff's Department, acting pursuant to an order entered by a juvenile court judge of the Family Court of Jefferson County. Plaintiffs' version of

---

[1] Plaintiffs spell the name of this defendant in all of their pleadings as "Ship." That is a misspelling: *see* the Answer of "Dr. Alan *Shipp*" filed July 11, 2001 (doc. no. 8) (emphasis supplied).

[2] *See* Fed. R. Civ. P. 17(c) (providing in pertinent part that "[a]n infant or incompetent person who does not have a duly appointed representative may sue by a next friend or by a guardian ad litem."); *see also* Ala.Code § 6-5-390 (1975) (providing in part that, in the event the mother and father of a minor child "are not lawfully living together as husband and wife, or in the event legal custody of such minor child has been lawfully vested in either of the parties ... then and in either event the party having legal custody of such minor child shall have the exclusive right to commence [an] action" for injury to the child); Ala.R.Civ.P. 17(c).



events follows.

## I. FACTUAL SUMMARY

Michael Washington was born on April 28, 1993, with Wiskott-Aldrich Syndrome, a hereditary blood disease.[3] He received a Haplo-identical stem cell transplant[4] from his biological father[5] on November 19, 1999, at Children's Hospital, an institution owned and operated by defendant Alabama Children's Health Systems, Inc.[6] As a result of that treatment, Washington required frequent hospitalization until about April 28, 2000, and periodic blood transfusions thereafter.[7] To that end, Washington attended a doctor's appointment on October 12, 2000, in order to receive a blood transfusion. According to plaintiffs, the attending physician "determined that his hemoglobin count was acceptable and that he did not need a blood transfusion."[8] Washington's

---

[3] *See* Complaint ¶ 14; *see also* plaintiffs' evidentiary submissions in opposition to summary judgment (doc. no. 15), Exhibit 4 (Dependency Petition). Dorland's Illustrated Medical Dictionary defines Wiskott-Aldrich syndrome as

> an X-linked immunodeficiency syndrome characterized by eczema [*i.e.*, a pruritic papulovesicular dermatitis occurring as a reaction to many endogenous and exogenous agents, characterized in the acute stage by erythema, edema associated with a serious exudate between the cells of the epidermis (spongiosis) and an inflammatory infiltrate in the dermis, oozing and vesiculation, and crusting and scaling...], thrombocytopenia [*i.e.*, disease in the number of blood platlets], and recurrent pyogenic infection. There is an inability to produce antibodies to polysaccharide antigens and increased susceptibility to infection with encapsulated bacteria (*Haemophilus influenza*, meningococcus, pneumococcus). Typically IgM is low and IgA and IgE are elevated; cutaneous anergy is common. There is also a high incidence of lymphoreticular malignant disease. Called also *Aldrich syndrome* and *immunodeficiency with thrombocytopenia and eczema*.

*Id.* at 1643 (28th ed. 1994) (italics in original); *see also id.* at 528, 1707, for the sources of the bracketed additions.

[4] Dorland's defines haplo-identical as "sharing a haplotype [*i.e.*, a set of alleles of a group of closely linked genes, such as the HLA complex, which is usually inherited as a unit]; having the same alleles [*i.e.*, any alternative form of a gene that can occupy a particular chromosomal locus] at a set of closely linked genes on one chromosome." *Id.* at 732, 47.

[5] *See* Plaintiffs' Evidentiary Submission in Opposition to Summary Judgment (doc. no. 15), at unnumbered page 3 (February 7, 2001 letter from Katherine Lineberry, a Nurse Clinician associated with Children's Hospital, and addressed "To Whom It May Concern").

[6] *See* Complaint ¶ 15.

[7] *Id.* ¶ 16.

[8] *Id.* ¶ 20.

2

blood count was scheduled to be checked once again on October 17, 2000.[9] He failed to attend that appointment, however, because plaintiffs had been told that, due to difficulty in matching Washington's blood type, no acceptable blood was available for transfusion.[10]

At approximately 4:30 p.m. on October 17, 2000, Washington was removed from his mother and step-father's home by deputies of the Jefferson County Sheriff's Department, acting pursuant to an order entered by a state juvenile court judge. The order had been issued in response to an *ex parte* "request for pick-up order" and dependency petition[11] submitted to the state court judge by defendant Mendi Jones, a licensed social worker employed by the defendant Alabama Department of Human Resources ("DHR").[12] The allegations of Ms. Jones's dependency petition were based upon information supplied by defendants Chrissy Holmes and Dr. Alan Shipp: a social worker and physician, respectively, employed at Children's Hospital by defendant Children's Health Systems, Inc. In pertinent part, Jones's dependency petition stated that:

> Child has Wiskott Aldriduge [sic] disorder and is in need of a blood transfusion. Child has missed 3 appointments w/in the last month. He missed an appointment today for transfusion that was needed last week, but blood was not available. Mom has not made any contact w/ DHR. Also she made no contact w/ Children's Hospital today about the missed appointment. Doctor states that if Michael doesn't have transfusion by 10/18/00 his condition will be detrimental.[13]

---

[9] *See id.*

[10] *Id.* ¶ 20-21.

[11] *See* plaintiffs' evidentiary submissions (doc. no. 15), at unnumbered pages 6 and 7. *See also, e.g.,* Ala. Code §§ 12-15-1(10) (defining "Dependent Child"), 12-15-2(a) (providing that Alabama's circuit and district courts "shall exercise original concurrent juvenile jurisdiction sitting as the juvenile court"), 12-15-30(a) (vesting "exclusive original jurisdiction" over "proceedings in which a child is alleged to be ... dependent" in the juvenile courts), 12-15-52 (defining form, content, and execution of dependency petitions), 12-15-53(d) (authorizing juvenile court to order an officer to take immediate custody of an allegedly dependent child), 12-15-56(1), (8) (same), and 12-15-65 (prescribing procedures for dependency hearings).

[12] See the motion to dismiss or, in the alternative, for summary judgment filed by defendants Fuller, Jones, and Alabama Department of Human Resources (doc. no. 12), Exhibit B (Affidavit of Mendi Jones).

[13] Plaintiffs' evidentiary submission in opposition to motion for summary judgment (doc. no. 15), at unnumbered page 7 ("Dependent Petition" filed in the Family Court of Jefferson County, Alabama, Case No. J.U. 2000-52792); *see also id.* at unnumbered page 6 (Oct. 17, 2000 "Request For A Pick-Up Order Upon The Filing Of A Dependent

Plaintiffs claim that defendants Holmes and Shipp knew, or should have known, that Washington had not missed three appointments, and that blood matching Washington's type would not be available for transfusion either on October 17, 2000, or "at any time in the near future."[14]   In any event, neither Regina Gilyard nor Anthony Patterson were contacted by any of the individual defendants regarding Washington's October 17, 2000 appointment, despite the fact that defendants had their current address and telephone information.[15]

Following the removal of Washington from his home, he was taken to a foster care facility by agents of DHR.[16]   Gilyard and Patterson were instructed to be at Children's Hospital at 8:00 a.m. the following morning.   They complied with that direction, but no blood was available for Washington's transfusion.[17]   Further, Gilyard and Patterson claim that, while they waited at

---

Petition"), stating in pertinent part: "Child has Wiskott Aldriudge [sic] disorder.  He has missed 3 appointments.  He is in need of a transfusion.  Doctor stated if he doesn't have transfusion by tomorrow afternoon his condition will be detrimental."

[14] Complaint ¶ 28.

[15] *Id.* ¶ 24.  Not surprisingly, defendant Jones supplied a somewhat different account of the events leading up to this action:

> On October 17, 2000, information was provided to me by Children's Hospital officials that Michael Washington had not been brought by his mother to a scheduled appointment that day for a blood transfusion that was needed to treat his Wiskott-Aldridge disorder.  Through my previous work with this family and through information given to me by Children's Hospital Officials, I was aware that other appointments had been missed in the past.  On October 17, 2000, the Hospital officials told me that if Michael was not brought in for his treatment by the next day, that it would be detrimental to his health.  I attempted to contact Michael's mother, Ms. Gilyard and his step-father, Anthony Patterson, at numbers that had previously been given to me by Children's Hospital officials and by the family. *I was unable to contact Ms. Gilyard or Mr. Patterson as both of the numbers were wrong numbers.* On October 17, 2000, I presented the information that I had to the Jefferson County Juvenile Court and requested an emergency pick-up order.  The Juvenile Judge granted the order and Michael was located and taken from his home by personnel from the Jefferson County Sheriffs Department.

Motion to Dismiss or, in the Alternative, for Summary Judgment (doc. no. 12), Exhibit B (Affidavit of Mendi Jones), at 2 (emphasis supplied).

[16] *See* defendants' motion to dismiss or, in the alternative, for summary judgment (doc. no. 12), Exhibit B (affidavit of Mendi Jones), at 2 ("I was present at the home at the time that Michael was removed.  He was placed in DHR custody and taken to a foster home for the night.").

[17] *Id.* ("On October 18, 2000 I met Ms. Gilyard and Mr. Patterson at Children's Hospital where we were told that there was no blood available that day for Michael's treatment.").

4

Children's Hospital on the morning of October 18, 2000, defendant "Jones and/or agents of DHR were made aware ... that [Washington's] health was not in any danger, nor had there been any danger to his health on October 17, when the Dependent Petition was filed."[18]  Despite this information, Jones "refused to withdraw the Petition and, in fact, refused to return Washington to Gilyard and instead made allegations against Gilyard of alcohol and drug abuse and allegations of physical abuse against Patterson."[19]

Later that same day, Alabama District Court Judge Elise D. Barclay conducted an evidentiary hearing on Jones's dependency petition.[20]  According to plaintiffs, "agents of DHR failed to disclose to the Judge that there was no basis for the petition and demanded that Gilyard and Patterson take a drug test before they would release Washington into their custody."[21]  Gilyard and Patterson each submitted to drug tests, which were negative, after which they were permitted to take Washington home.[22]  Even so, according to plaintiffs, they were awarded only physical custody of Washington; legal custody remained with DHR.[23]  Plaintiffs attended another hearing for unspecified reasons on

---

[18] Complaint ¶ 33.

[19] *Id.* ¶ 34.

[20] Alabama Code § 12-15-2(a) provides that the State's circuit and district court judges "shall exercise concurrent juvenile jurisdiction sitting as the juvenile court."

[21] Complaint ¶ 35. Defendant Mendi Jones's account of these events is as follows:

A hearing was held that same day in the Jefferson County Juvenile Court. I recommended to the Judge that Michael be returned home. Based on information earlier provided to me by Children's Hospital officials that other patients had reported that Ms. Gilyard was using drugs while staying with Michael during earlier hospital visits, and based on the fact that Michael had told his foster parent that morning that his parents rolled their own cigarettes and smoked out of a pipe, I also recommended to the court that Ms. Gilyard and Mr. Patterson be given a drug test. The court included this in the order and a drug test was performed. ... Michael went home with Ms. Gilyard and Mr. Patterson that day, though legal custody remained with DHR until a subsequent court hearing on February 13, 2001. ...

Defendants' motion to dismiss or, in the alternative, for summary judgment (doc. no. 12), Exhibit B (affidavit of Mendi Jones), at 2-3.

[22] *Id.* ¶¶ 36-37.

[23] *Id.* ¶ 36; *see also* Ala. Code § 12-15-71(a)(3)a. (authorizing juvenile court judge to transfer legal custody of

October 23, 2000.[24]  DHR did not dismiss the dependency petition until February 13, 2001.[25]

## II. PROCEDURAL HISTORY

Plaintiffs filed a nine count complaint in this court on June 12, 2001, asserting jurisdiction

as follows:

> 11. Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1343(3) and
> 1343(4) [sic[26]] conferring original jurisdiction upon this Court of any civil action to
> recover damages or to secure equitable relief under any Act of Congress providing
> for the protection of civil rights, and under the *Declaratory Judgment Statute* under
> 42 U.S.C. § 1983, as there is a federal question.
>
> . . .
>
> 13. This is a proceeding for declaratory and injunctive relief and monetary
> damages to redress the deprivation of rights secured to the Plaintiffs by the *Civil
> Rights Act of 1871*, 42 U.S.C. §§ 1983, 1988 and the *Civil Rights Act of 1964*, as
> amended in 1972.[27]

The first five counts of plaintiffs' complaint pertain solely to defendants Alabama Children's

Health Systems, Inc., Dr. Alan Shipp, and Chrissy Holmes ("Children's Hospital defendants"), and

---

a child found to be dependent to the state Department of Human Resources); and defendants' motion to dismiss or, in
the alternative, for summary judgment (doc. no. 12), Exhibit B (affidavit of Mendi Jones), Attachment II (Oct. 18, 2000
juvenile court "Judgment/Order") (providing, in part, that "Mother and Anthony Patterson *agree to have a drug screen*
this date," and that, "[p]ending further hearing, legal custody shall remain with JCDHR. *By agreement*, the child may
reside with mother.") (emphasis supplied).

[24] Complaint ¶ 37.

[25] *Id.* ¶¶ 37-38.

[26] 28 U.S.C. § 1343(a) provides — in the parts that counsel presumably intended to cite — that district courts
shall have original jurisdiction of any civil action authorized by law to be commenced by any person:

> (3) To redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or
> usage, of any right, privilege or immunity secured by the Constitution of the United States or by any
> Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the
> United States;
>
> (4) To recover damages or to secure equitable or other relief under any Act of Congress providing for
> the protection of civil rights, including the right to vote.

28 U.S.C. § 1343(a)(3), (a)(4).

[27] Complaint ¶¶ 11, 13 (italics in original).

allege only state law claims:  *i.e.*, "negligent and wanton slander";[28] "negligently and/or wantonly provid[ing] false information";[29] invasion of privacy;[30] negligent failure to train and supervise employees;[31] and outrage.[32]

The remaining counts of the complaint assert federal claims, and appear to be directed at all defendants — including Bill Fuller, who is sued both individually and in his official capacity as Commissioner of the Alabama Department of Human Resources.  Count VI is based upon 42 U.S.C. § 1983,[33] and alleges that "one or more or of all of the Defendants, while acting in their official capacity and under color of State law and/or pursuant to an official policy, custom and/or practice endorsed by the City, County, and/or State," deprived plaintiff Washington of his Fourth Amendment right "to be secure in his home against unreasonable seizure of his person," and his First Amendment right to "freedom of association."[34]  Counts VII and VIII also are based upon § 1983, and allege that "one or more or all of the Defendants, while acting in their official capacity, and under color of State law,"[35] deprived plaintiffs Gilyard and Patterson of their First, Fourth, and Fifth

---

[28] *See, e.g., id.* ¶ 40 (Count I) ("Defendant Ship [sic], while acting within the line and scope of his employment with the Defendant Children's [Hospital], negligently and/or wantonly made slanderous remarks to the parents of other patients in the clinic stating that Plaintiff Gilyard was an alcoholic and that she had problems taking care of her son.").

[29] *See, e.g., id.* ¶ 49 (Count II) ("Defendant Holmes, while acting within the line and scope of her employment with Defendant Children's [Hospital], along with other employees, servants and/or agents of Defendant's Children's, megligently and/or wantonly provided false information regarding the health of Plaintiff Washington and the care that Plaintiffs Gilyard and Patterson provided to Plaintiff Washington to a governmental agency with the intent of causing that agency to start a civil action against the Plaintiffs.").

[30] *See id.* ¶¶ 55 & 58 (Count III).

[31] *See id.* ¶¶ 60-69 (Count IV).

[32] *See id.* ¶¶ 70-75 (Count V) (alleging that defendant Holmes, while acting within the line and scope of her employment with defendant Alabama Children's Health System, Inc., "intentionally and/or reckless provided confidential medical information regarding the health of Plaintiffs ... to Defendant DHR without prior approval from the Plaintiffs," and that such "actions were so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency and are atrocious and utterly intolerable in a civilized society.").

[33] Complaint ¶ 78.

[34] *Id.* ¶ 77.

[35] *Id.* ¶¶ 83, 90.

Amendment rights by forcing each of them to submit to a drug test on October 18, 2000, in order to regain physical custody of Washington.  Finally, in Count IX, plaintiffs allege that "one or more or of all of the Defendants, while acting in their official capacity and under color of State law," deprived all plaintiffs of their Fourteenth Amendment substantive due process rights by removing Washington from his home and forcing Gilyard and Patterson to submit to drug testing procedures.

The Alabama Department of Human Resources, its Commissioner, Bill Fuller, and Mendi Jones ("State defendants") responded to plaintiffs' complaint by filing a motion to dismiss or, in the alternative, for summary judgment.[36]  The motion was supported by affidavits and exhibits. Accordingly, this court informed the parties of its intention to consider the motion as one for summary judgment pursuant to Rule 56 by mean of an order establishing a schedule for submitting briefs and evidentiary materials.[37]

Plaintiffs opposed summary judgment with a brief and evidentiary materials.[38]  They also filed an amendment to their original complaint,[39] adding four counts, each of which assert claims against defendant Mendi Jones in her individual capacity.[40]  Count X of the amended complaint is based upon § 1983, and alleges that Jones is liable to Washington for deprivations of his First and Fourth Amendment rights, because:  (a) she "knew or should have known that the information she based the Dependency Petition upon was false";[41] (b) Jones made false statements under oath and

---

[36] Doc. no. 12.  Two of the three Children's Hospital defendants answered the complaint.  *See* doc. nos. 8 (July 11, 2001 Answer of Dr. Alan Shipp) and 9 (July 13, 2001 Answer of Alabama Children's Health Systems, Inc.).  The remaining defendant, Chrissy Holmes, was not served until December 11, 2001 (*see* doc. no. 29).

[37] Doc. no. 14.

[38] *See* doc. nos. 18 (brief) and 15 (evidentiary submission).

[39] Doc. no. 16.

[40] *Id.* ¶ 3 ("Plaintiffs are suing Defendant Jones in her personal capacity.").

[41] *Id.* ¶ 27.

gave false testimony in support of the dependency petition; and, (c) she "failed to withdraw the Dependency Petition when she knew that the information that it was based upon was false."[42] Counts XI and XII allege that Jones is further liable to Gilyard and Patterson for deprivations of their First, Fourth, and Fifth Amendment rights, as in Counts VII and VIII. Finally, Count XIII alleges that Jones deprived all plaintiffs of their Fourteenth Amendment substantive due process rights by causing Washington to be removed from his home, and, Gilyard and Patterson to take drug tests.

The State defendants responded to plaintiffs' amended complaint by filing a "supplemental" motion to dismiss or, in the alternative, for summary judgment.[43] The State defendants' original and supplemental motions now are considered together, below.

### III. STANDARD OF REVIEW

When, as in this case, matters outside the pleadings are presented to and considered by the court in ruling upon a motion to dismiss, "the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56." Fed. R. Civ. P. 12(b).

Federal Rule of Civil Procedure 56(c) provides, in part, that summary judgment not only is proper, but "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Thus, "the plain language of Rule 56(c) mandates the entry of summary judgment, after

---

[42] *Id.* ¶ 29.

[43] *See* Supplemental Motion to Dismiss, etc. (doc. no. 20). The Alabama Children's Health Systems, Inc. answered the amended complaint (doc. nos. 19 and 27), as did Chrissy Holmes (doc. no. 30). The remaining Children's Hospital defendant, Dr. Alan Shipp, apparently concluded that nothing alleged in plaintiffs' amended complaint required a response by him.

adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corporation v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

> In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment.
>
> The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case. The relevant rules of substantive law dictate the materiality of a disputed fact. A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.

*Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (en banc) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)); *see also United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir. 1991) (en banc). The motion pierces the pleadings, and "strikes at the heart of the claim. In effect it argues that as a matter of law upon admitted or established facts the moving party is entitled to prevail." Charles Alan Wright, *The Law of Federal Courts* § 99, at 705 (5th ed. 1994).

Applying the foregoing standards to the pleadings, briefs, and evidentiary materials submitted, this court concludes that the State defendants' motions are due to be granted. Further, after a review of plaintiffs' remaining claims against the Children's Hospital defendants, the court concludes that plaintiffs' claims against those defendants also are due to be dismissed.

### IV. DISCUSSION

The State defendants assert, first, that plaintiffs' claims against DHR, as well as those against Fuller and Jones in their official capacities, are barred by the Eleventh Amendment. These

defendants also contend that plaintiffs have failed to state a claim under 42 U.S.C. § 1983, because none of the State defendants is a "person" as intended by that statutory provision. The State defendants further contend that plaintiffs have failed to allege sufficient facts to establish that defendants Fuller and Jones violated clearly established constitutional law and, accordingly, to the extent that those defendants are being sued in their individual capacities, both are entitled to qualified immunity. Finally, the State defendants assert that plaintiffs' claims are barred by the *Rooker-Feldman* doctrine. To the extent necessary, each of these arguments is considered below.

**A.    Eleventh Amendment Immunity and Official Capacity Claims**

The Eleventh Amendment limits the power of federal courts to hear suits instituted by private litigants against a state. The Amendment provides that "[t]he Judicial Power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. Eleventh Amendment jurisprudence dictates that, subject to some exceptions, "nonconsenting States may not be sued by private individuals in federal court." *Board of Trustees of the University of Alabama v. Garrett*, 531 U.S. 356, ___, 121 S.Ct. 955, 962, 148 L.Ed.2d 866 (2001) (citing *Kimel v. Florida Board of Regents*, 528 U.S. 62, 73, 120 S.Ct. 631, 640, 145 L.Ed.2d 522 (2000) ("[T]he Constitution does not provide for federal jurisdiction over suits against nonconsenting States.")). The protection provided to states by the Eleventh Amendment was been extended to state departments and agencies, *Pennhurst State School and Hospital v. Halderman*, 465 U.S. 89, 100, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984), as well as state officials sued in an official capacity. *Carr v. City of Florence, Alabama*, 916 F.2d 1521, 1524 (11th Cir. 1990).

Further explication of Eleventh Amendment doctrine is unnecessary, because plaintiffs

11

appear to have abandoned their claims against DHR, Fuller in his official and individual capacities, and Mendi Jones in her official capacity. Instead, plaintiffs assert that the purpose for filing their amended complaint was to "specifically state[] that this case is brought against Mendi Jones in her individual capacity."[44] Indeed, plaintiffs state only that "[t]here is a material issue of fact whether Jones was acting in her official or personal capacity ...."[45]

## B.      Individual Capacity Claims Against Jones

Plaintiffs' claims against Jones in her individual capacity stem entirely from sworn statements contained in the dependency petition[46] and "request for pick-up order"[47] she submitted to a state juvenile court judge on October 17, 2000, and testimony given by her in an evidentiary hearing conducted the following day.[48] Plaintiffs assert that, "but for the false information provided and/or material misrepresentation[s]" made by Jones to the state court, "Washington would not have

---

[44] Plaintiffs' Response to Defendants' Motion for Summary Judgment (doc. no. 18), at unnumbered page 6. As further support for this court's textual interpretation it should be noted that, in both of their responses to the State defendants' original and supplemental motions, plaintiffs fail to make reference to any of the State defendants, other than Mendi Jones, and fail to dispute defendants' Eleventh Amendment arguments. *See* doc. nos. 18 and 23. When a motion for summary judgment is made and supported as provided by the Federal Rules of Civil Procedure, plaintiffs, as the adverse parties:

> may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Fed. R. Civ. P. 56(e). Thus, in opposing a motion for summary judgment, "a party may not rely on his pleadings to avoid judgment against him." *Ryan v. International Union of Operating Engineers, Local 675*, 794 F.2d 641, 643 (11th Cir. 1986). "Rather, the onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned." *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995).

[45] Plaintiffs' Response to Defendants' Motion for Summary Judgment (doc. no. 18), at unnumbered page 6.

[46] *See* plaintiff's evidentiary submission in opposition to motion for summary judgment (doc. no. 15), at unnumbered page 7.

[47] *See id.* at unnumbered page 6.

[48] *See* Amended Complaint (doc. no. 16) ¶ 12.

been removed from his home and his parent[s] would not have been forced to take a drug test."[49] Plaintiffs contend that there remain material issues of fact as to whether Jones's conduct violated plaintiffs' constitutional rights, and whether Jones is entitled to qualified immunity.[50]  To that end, plaintiffs argue that they "have the right to conduct discovery before a Summary Judgment Motion is due to be heard."[51]

The court concludes instead that plaintiffs' claims against Jones in her individual capacity must fail, because Jones is entitled to absolute immunity from suit for testimony given in the state juvenile court hearing, and to qualified immunity for the sworn statements contained in the dependency petition submitted to that court.

### 1.    Absolute immunity accorded testimony given in a judicial proceeding

None of the parties addressed the doctrine of absolute immunity.  Accordingly, a brief review of guiding principles follows.

The text of 42 U.S.C. § 1983 does not explicitly address the topic of immunity.[52]  Even so, the Supreme Court has concluded on the basis of historical analysis and a review of legislative

---

[49] *Id.* at unnumbered pages 6-7.

[50] *See id.* at 7-11.

[51] *See* Plaintiffs's Response (II) (doc. no. 23), at unnumbered 1.

[52] Section 1983 provides a means of seeking redress against governmental entities and officials whose conduct under color of state law deprives a plaintiff of rights, privileges, or immunities secured by the United States Constitution or federal statutes.  In pertinent part, the statute provides that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.  ...

42 U.S.C. § 1983.

history that Congress intended to incorporate the common law immunities then available when enacting § 1983 on April 20, 1871,[53] "or it would have explicitly provided otherwise." *Jones v. Cannon*, 174 F.3d 1271, 1281 (11th Cir. 1999) (citing *Buckley v. Fitzsimmons*, 509 U.S. 259, 268, 113 S.Ct. 2606,125 L.Ed.2d 209 (1993); *Malley v. Briggs*, 475 U.S. 335, 339-40, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986); *Imbler v. Pachtman*, 424 U.S. 409, 417-18, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976)).

### a.   Testimonial immunity for private witnesses

Under the common law, witnesses who gave testimony in judicial proceedings were entitled to absolute immunity from a civil suit for damages.  The Supreme Court described this doctrine in *Briscoe v. LaHue*, 460 U.S. 325, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983):

> The immunity of parties and witnesses from subsequent damages liability for their testimony in judicial proceedings was well established in English common law. ...
>
> In the words of one 19th century court, in damages suits against witnesses, "the claims of the individual must yield to the dictates of public policy, which requires that the paths which lead to the ascertainment of truth should be left as free and unobstructed as possible." *Calkins v. Sumner*, 13 Wis. 193, 197 (1860).  A witness's apprehension of subsequent damages liability might induce two forms of self-censorship. First, witnesses might be reluctant to come forward to testify. And once a witness is on the stand, his testimony might be distorted by the fear of subsequent liability. ... A witness who knows that he might be forced to defend a subsequent lawsuit, and perhaps to pay damages, might be inclined to shade his testimony in favor of the potential plaintiff, to magnify uncertainties, and thus to deprive the finder of fact of candid, objective, and undistorted evidence.  But, the truth-finding process is better served if the witness's testimony is submitted to the "crucible of the judicial process so that the factfinder may consider it, after cross-examination, together with the other evidence in the case to determine where the truth lies." *Imbler v. Pachtman*, 424 U.S. 409, 440, 96 S.Ct. 984, 999, 47 L.Ed.2d 128 (1976) (White, J., concurring in the judgment).

---

[53] Section 1983 was enacted as § 1 of the Civil Rights Act of 1871 (also known as "The Ku Klux Klan Act"), 17 Stat. 13.  It was "modeled" on § 2 of the Civil Rights Act of 1866, and enacted for the express purpose of enforcing the Fourteenth Amendment. *Mitchum v. Foster*, 407 U.S. 225, 238-39, 92 S.Ct. 2151,2159-60, 32 L.Ed.2d 705 (1972).

*Briscoe*, 460 U.S. at 330-31, 332-33; 103 S.Ct. at 1113, 1114-15 (some citations omitted). On the basis of such considerations, the Court concluded that — "[a]t least with respect to private witnesses" — "the common law's protection for witnesses is 'a tradition so well-grounded in history and reason' that we cannot believe that Congress impinged on it 'by covert inclusion in the general language before us.'" *Id.* at 334, 103 S.Ct. at 1115 (quoting *Terry v. Brandhove*, 341 U.S. 367, 376, 71 S.Ct. 783, 788, 95 L.Ed. 1019 (1951)); *see also Strength v. Hubert*, 854 F.2d 421 (11th Cir. 1988) (granting witnesses absolute immunity for testimony during grand jury proceedings).

### b.   Absolute immunity for persons performing official functions in the judicial process

Out of this common law heritage has come absolute immunity for state court "judges, prosecutors, and other persons acting 'under color of law' who perform official functions in the judicial process." *Briscoe*, 460 U.S. at 334, 103 S.Ct. at 1115; *see also  Stump v. Sparkman*, 435 U.S. 349, 98 S.Ct. 1099, 55 L.Ed. 2d 331 (1978) (state judges are absolutely immune from liability for their judicial acts); *Pierson v. Ray*, 386 U.S. 574, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967) (same); *Imbler v. Pactman, supra* (state prosecutors are absolutely immune from liability for their actions in initiating prosecutions). This is because, without the cloak of absolute immunity to protect them, "'judges, advocates, and witnesses [could not] perform their respective functions without harassment or intimidation.'" *Briscoe*, 460 U.S. at 335, 103 S.Ct. at 1115 (quoting *Butz v. Economou*, 438 U.S. 478, 512, 98 S.Ct. 2894, 2913, 57 L.Ed.2d 895 (1978)).

The Supreme Court also has concluded that the same historical principles of absolute liability that protect state court judges and prosecutors should shield police officers for testimony given in criminal trials.

> Subjecting government officials, such as police officers, to damages liability under § 1983 for their testimony might undermine not only their contribution to the judicial process, but also the effective performance of their other public duties.
>
> . . .
>
> As this Court noted when it recognized absolute immunity for prosecutors in *Imbler*, if the defendant official "could be made to answer in court each time [a disgruntled defendant] charged him with wrongdoing, his energy and attention would be diverted from the pressing duty of enforcing the criminal law." 424 U.S., at 425, 96 S.Ct., at 992. ...

*Briscoe*, 460 U.S. at 343-44, 103 S.Ct. at 1119-20 (bracketed alteration in original). The Eleventh

Circuit has extended a policy officer's absolute immunity to testimony given in preliminary hearings

held pursuant to Alabama law, *Scarbrough v. Myles*, 245 F.3d 1299, 1305 (11th Cir. 2001), or in

front of a grand jury. *Kelly v. Curtis*, 21 F.3d 1544, 1553 (1th Cir. 1994); *Strength v. Hubert*, 854

F.2d 421 (11th Cir. 1988). "The penalty for false testimony under such circumstances is the same

for any witness, that is, a potential prosecution for perjury." *Jones v. Cannon*, 174 F.3d at 1281; *see*

*also Scarbrough*, 245 F.3d at 1305 (same).

Based on the common law history and modern application of the absolute immunity doctrine,

plaintiffs cannot maintain an action against Jones for the testimony she gave during the October 18,

2000 state court hearing. Jones then was performing "official functions in the judicial process."

*Briscoe*, 460 U.S. at 334, 103 S.Ct. at 1115. The fact that Jones is a social worker — and not a

judge, prosecutor, or police officer, specifically acknowledged by the Supreme Court to be entitled

to absolute immunity — is of no moment, because "immunity analysis rests on a functional category,

not on the status of the defendant." *Briscoe*, 460 U.S. at 342, 103 S.Ct. at 1119. As the Eleventh

Circuit observed in *Jones v. Cannon*,

> a functional approach has evolved to determine whether executive branch public

16

officals should be granted absolute immunity for taking particular actions, or whether they should enjoy instead only the qualified immunity afforded public officials. *Buckley* [*v. Fitzsimmons*, 509 U.S. 259, 269, 113 S.Ct. 2606, 125 L.Ed.2d 209 (1993)]. Courts must look to "'nature of the function performed, not the identity of the actor who performed it.'" *Id.* (quoting *Forrester v. White*, 484 U.S. 219, 229, 108 S.Ct. 538, 98 L.Ed.2d 555 (1988)).

174 F.3d at 1282.

The rule of absolute immunity thus applies to a governmental official like Jones, even assuming (as this court must) that she gave false testimony during the state court hearing. The *Briscoe* Court reviewed hundreds of pages of the legislative history of § 1983, and concluded that Congress did not intend perjury by a government official (there, leading to an unjust conviction) to amount to a constitutional deprivation compensable under § 1983. *See Briscoe*, 460 U.S. at 340, 341 n.26, 103 S.Ct. at 1118, 1118 n.26. This is because

> [i]t is precisely the function of a judicial proceeding to determine where the truth lies. The ability of courts, under carefully developed procedures, to separate truth from falsity, and the importance of accurately resolving factual disputes in criminal (and civil) cases are such that those involved in judicial proceedings should be "given every encouragement to make a full disclosure of all pertinent information within their knowledge."

*Id.* at 335, 103 S.Ct. at 115 (quoting *Imbler v. Pachtman*, 424 U.S. 409, 439, 96 S.Ct. 984, 999, 47 L.Ed.2d 128 (1976) (White, J., concurring)).

Rather than subject Jones to civil liability under § 1983 for testimony given in the state juvenile court proceeding, "[a]s with any witness testifying under oath, the penalty for false testimony is potential prosecution for perjury." *Scarbrough*, 245 F.3d at 1305 (citing *Briscoe*, 460 U.S. at 342, 103 S.Ct. at 1119; *Jones*, 174 F.3d at 1281).

> As is so often the case, the answer must be found in a balance between the evils inevitable in either alternative. In this instance it has been thought in the end better to leave unredressed the wrongs done by dishonest officers than to subject those who

try to do their duty to the constant dread of retaliation.

*Gregoire v. Biddle*, 177 F.2d 579, 581 (2d Cir. 1949) (Hand, J.) (cited with approval in *Briscoe*, 460 U.S. at 345, 103 S.Ct. at 1120-21).

### 2. Qualified immunity for sworn statements contained in dependency petition and request for juvenile pick-up order

The same level of protection does not attach to the sworn statements contained in the dependency petition and "request for pick-up order" submitted by Jones to the state juvenile court judge on October 17, 2000. The function performed by Jones on that occasion — *i.e.*, submitting information to the court that had been "supplied to Defendant Jones by employees and/or agents of Defendant Children's,"[54] without first confirming "that the information was true"[55] — was more like the circumstances addressed by the Supreme Court in *Malley v. Briggs*, 475 U.S. 335, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986). In *Malley*, the Court held that a police officer's submission of an affidavit containing false statements to a state district court judge, in support of the officer's application for an arrest warrant, "while a vital part of the administration of criminal justice," was too far removed from the judicial phase of criminal proceedings to be the kind of action entitled to absolute immunity. *Id.* at 342-43, 106 S.Ct. at 1097; *see also Kalina v. Fletcher*, 522 U.S. 118, 118 S.Ct. 502, 508-09, 139 L.Ed.2d 471 (1997) (holding that liability may also result from a prosecutor's false statements in an affidavit presented to a county superior court in support of a request for an arrest warrant). Rather, Jones's actions on those occasions must be addressed under the doctrine of qualified immunity.

---

[54] Plaintiffs' Amended Complaint (doc. no. 16) ¶ 4.

[55] *See id.* ¶¶ 5 ("Defendant Jones failed to talk with Plaintiff Washington's case worker to confirm the information."), 6 ("Defendant Jones failed to even attempt to verify that the information was true."), and 7 ("Defendant Jones, in a signed, sworn statement, petitioned the Family Court of Jefferson County to remove Plaintiff Washington from his home.").

When a state or local governmental official is sued personally, or in an "individual capacity," for money damages under § 1983, the official may invoke the doctrine of "qualified immunity" as a defense to the claim. *See, e.g., Kentucky v. Graham,* 473 U.S. 159, 165, 105 S.Ct. 3099, 3105, 87 L.Ed.2d 114 (1985); *Busby v. City of Orlando,* 931 F.2d 764, 772 (11th Cir. 1991).

Essentially, the doctrine of qualified immunity provides that "[g]overnment officials performing discretionary functions are entitled to qualified immunity 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Hartley v. Parnell,* 193 F.3d 1263, 1268 (11th Cir. 1999) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)).[56]

> The general rule of qualified immunity is intended to provide government officials with the ability "reasonably [to] anticipate when their conduct may give rise to liability for damages." ... Where that rule is applicable, officials can know that they will not be held personally liable as long as their actions are reasonable in light of current American law.

*Anderson v. Creighton,* 483 U.S. 635, 646, 107 S.Ct. 3034, 3042, 97 L.Ed.2d 523 (1987) (quoting *Davis v. Scherer,* 468 U.S. 183, 195, 104 S.Ct. 3012, 3019, 82 L.Ed.2d 139 (1984)).

Qualified immunity "is the usual rule; only in exceptional cases will government actors have no shield against claims made against them in their individual capacities." *Lassiter v. Alabama A & M University Board of Trustees,* 28 F.3d 1146, 1149 (11th Cir. 1994) (en banc) (citations and footnote omitted). Qualified immunity "gives ample room for mistaken judgments by protecting all but the plainly incompetent and those who knowingly violate the law." *Hunter v. Bryant,* 502 U.S. 224, 229, 112 S.Ct. 534, 537, 116 L.Ed.2d 589 (1991) (internal quotations and citations omitted);

---

[56] *See also, e.g., Jackson v. Sauls,* 206 F.3d 1156, 1164 (11th Cir. 2000) ("Qualified immunity shields a § 1983 defendant from liability for harms arising from discretionary acts, as long as the discretionary acts do not violate clearly established federal statutory or constitutional rights of which a reasonable person would have known.").

*see also, e.g.*, *Busby v. City of Orlando*, 931 F.2d 764, 773 (11th Cir. 1991) ("This standard shields all government officials except those who either are plainly incompetent or who knowingly violate the law.") (citations omitted).

Once the qualified immunity defense is raised,[57] it is *the plaintiffs* who "bear the burden of showing that the federal 'rights' allegedly violated were 'clearly established.'" *Lassiter*, 28 F.3d at 1150 n.3 (quoting *Barts v. Joyner*, 865 F.2d 1187, 1190 (11th Cir. 1989); *see also Mitchell v. Forsyth*, 472 U.S. 511, 528, 105 S.Ct. 2806, 2816, 86 L.Ed.2d 411 (1985)); *Busby*, 931 F.2d at 773 ("The plaintiff has the burden of showing that the defendant violated clearly established constitutional rights.").

In analyzing a qualified immunity defense, district courts are to consider only the "clearly established law and the information possessed by the official at the time the conduct occurred." *Hope v. Pelzer*, 240 F.3d 975, 981 (11th Cir. 2001) (citation and internal quotation marks omitted). "For qualified immunity to be surrendered, pre-existing law must dictate, that is, truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what defendant is doing violates federal law in the circumstances." *Lassiter*, 28 F.3d at 1150.

It is at this juncture that plaintiffs' claims against Jones fail, because "courts must not permit plaintiffs to discharge their burden by referring to general rules and to the violation of abstract 'rights.'" *Lassiter*, 28 F.3d at 1050 (citations omitted).

> "General propositions have little to do with the concept of qualified immunity." *Muhammad v. Wainwright*, 839 F.2d 1422, 1424 (11th Cir. 1987). "If case law, in factual terms, has not staked out a bright line, qualified immunity almost always protects the defendant." *Post v. City of Fort Lauderdale*, 7 F.3d 1552, 1557

---

[57] *See* Motion to Dismiss (doc. no. 12), at 13; Supplemental Motion to Dismiss (doc. no. 20), at 8.

(11th Cir. 1993), *modified*, 14 F.3d 583 (11th Cir. 1994); *accord Kelly v. Curtis*, 21 F.3d 1544, 1554 (11th Cir. 1994).[58]  "The line is not to be found in abstractions — to act reasonably, to act with probable cause, and so forth — but in studying how these abstractions have been applied in concrete circumstances." *Barts*, 865 F.2d at 1194.

*Lassiter*, 28 F.3d at 1150.  When attempting to demonstrate that the federally protected rights

allegedly violated by a governmental official were "clearly established," a plaintiff

> *must establish more than broad legal truisms; he or she must demonstrate that the law fixed the contours of the right so clearly that a reasonable official would have understood his acts were unlawful.* ...  Thus, "pre-existing law must dictate, that is truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what defendant is doing violates federal law in the circumstances." *Lassiter v. Alabama A & M University, Bd. of Trustees*, 28 F.3d 1146, 1150 (11th Cir. 1994) (en banc).  Moreover officials need not "'be creative or imaginative in drawing analogies from previously decided cases.'" *Id.* at 1150. (citations omitted).

*Dolihite v. Maughon*, 74 F.3d 1027, 1040-41 (11th Cir. 1996) (emphasis supplied).  This means that

plaintiffs needed to cite this court to relevant case law.

> When case law is needed to "clearly establish" the law applicable to the pertinent circumstances, we look to decisions of the U.S. Supreme Court, the United States Court of Appeals for the Eleventh Circuit, and the highest court of the pertinent state. *See Jenkins*, 115 F.3d at 827 n.4.  We do not understand *Wilson v. Layne*, 526 U.S. 603, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999), to have held that a "consensus of cases of persuasive authority" from other courts would be able to establish the law clearly. *Id.* at 1700.  Each jurisdiction has its own body of law, and splits between jurisdictions on matters of law are not uncommon. *We do not expect public officials to sort out the law of every jurisdiction in the country.*

*Marsh*, 268 F.3d at 1032 n.10 (emphasis added).  Plaintiffs, however, have not provided this court

even one decision on similar facts that "dictate[s]" or "truly compel[s] (not just suggest[s] or

---

[58] The *Lassiter* court added the following caveat in a marginal note:

> We leave open the possibility that occasionally the words of a federal statute or federal constitutional provision will be specific enough to establish the law applicable to particular circumstances clearly and to overcome qualified immunity even in the absence of case law.

*Lassiter*, 28 F.3d at 1150 n.4.

allow[s] or raise[s] a question about), the conclusion for every like-situated, reasonable government agent that what defendant [Mendi Jones was] doing violates federal law in the circumstances." *Lassiter*, 28 F.3d at 1150. Instead, plaintiffs merely state that it "is an established fact that the First, Fourth, Fifth and Fourteenth Amendments of the United States Constitution are constitutional rights of which a reasonable person would have known."[59] Clearly, that will not suffice to pierce Jones's qualified immunity to plaintiffs' claims.

## C.   *Rooker-Feldman* doctrine

Even if defendant Jones were not entitled to qualified immunity for the allegedly false statements contained in the dependency petition and request for pick-up order she submitted to the state juvenile court judge, plaintiffs' claims in that regard still are barred by the so-called "*Rooker-Feldman* doctrine,*" which deprives federal district courts and circuit courts of appeal of subject matter jurisdiction over claims that are inextricably intertwined with a previous state court judgment when the federal plaintiff had a reasonable opportunity to raise the federal claims in the state court proceedings. *See, e.g., Rooker v. Fidelity Trust Co.*, 263 U.S. 413, 415-16, 44 S.Ct. 149, 150, 68 L.Ed. 362 (1923); *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462, 476-82, 103 S.Ct. 1303, 1311-15, 75 L.Ed.2d 206 (1983); *Siegel v. LePore*, 234 F.3d 1163, 1172 (11th Cir. 2000) (en banc); *Dale v. Moore*, 121 F.3d 624, 626 (11th Cir. 1997); *Powell v. Powell*, 80 F.3d 464, 467 (11th Cir. 1996). "A federal claim is inextricably intertwined with a state court judgment if the federal claim succeeds only to the extent that the state court wrongly decided the issues before it." *Siegel*, 234 F.3d at 1172. A party's ability to raise a claim on appeal of the state court judgment constitutes a reasonable opportunity to raise his claim in the state court proceedings. *See Blue Cross*

---

[59] Plaintiffs' Response to Defendants' Motion for Summary Judgment (doc. no. 23), at unnumbered page 9; Plaintiffs' Response to Defendants' Original Motion for Summary Judgment (doc. no. 18), at unnumbered page 11.

*and Blue Shield of Maryland, Inc. v. Weiner*, 868 F.2d 1550, 1555 (11th Cir. 1989).

The Eleventh Circuit recently considered, and rejected, a virtually identical claim in

*Goodman ex rel Goodman v. Sipos*, 259 F.3d 1327 (11th Cir. 2001).  In that case,

> Plaintiff Kim Goodman ("Goodman"), on her own behalf and on behalf of her son
> Michael Goodman ("Michael"), brought this action pursuant to 42 U.S.C. § 1983
> against Defendants Patricia Sipos and D'Anna Liber, employees of the Georgia
> Department of Family and Children Services ("DFCS"), seeking damages for alleged
> violations of their constitutional rights in connection with the investigation and
> initiation of a state juvenile proceeding to remove Michael from Goodman's custody.

*Id*. at 1328.  Among other claims asserted, the *Goodman* plaintiffs alleged that the affidavit of

Patricia Sipos, filed in support of DFCS' ex parte petition for custody, "was intentionally or

recklessly false," *id*. at 1330, and that the false statements and ex parte proceedings violated their

rights under the Due Process Clause of the Fourteenth Amendment. *See id*. at 1330, 1334.  As the

*Goodman* Court observed, however, such

> contentions strike at the heart of the state court's proceedings and judgment, because
> the state court decided to take away Goodman's custody of Michael only after finding
> Sipos' affidavit to be credible and finding that the ex parte order was justified.  This
> claim "succeeds only to the extent that the state court wrongly decided" the custody
> issue. *Siegel*, 234 F.3d at 1172.  So, the claim is barred if the plaintiffs had a
> reasonable opportunity to present it in the state court proceeding, a matter we will
> discuss shortly.
>
> . . .
>
> But did the plaintiffs have a reasonable opportunity to present their
> constitutional claims during the state juvenile court proceedings? *See Wood v.
> Orange County*, 715 F.2d 1543, 1547 (11th Cir.1983).  We think so.  Georgia law
> permits constitutional challenges to a juvenile court's orders to be brought in the
> juvenile court, and those challenges are subject to review by the Georgia Supreme
> Court, and ultimately by the United States Supreme Court. *See, e.g., In re Suggs*, 249
> Ga. 365, 291 S.E.2d 233 (1982) (considering constitutional challenge to state statute
> and juvenile court order on appeal from juvenile court).  The plaintiffs were both
> parties to the state court proceeding, and with the exception of the initial hearing on
> DFCS's ex parte petition to take custody, they were present and participated in the

state court proceedings. Therefore, the plaintiffs had a reasonable opportunity to bring their constitutional challenges to the veracity of Sipos' affidavit and the propriety of the state court's ex parte proceeding in the state court. ... It follows that the district court correctly determined that under the *Rooker-Feldman* doctrine it had no jurisdiction over the false affidavit, ex parte proceeding, and threat claims.

*Goodman*, 259 F.3d at 1334-35.

In like manner, with the exception of the ex parte proceeding at which DHR presented its request for pick-up order and dependency petition to the state juvenile court on October 17, 2000, plaintiffs participated in the October 17th hearing: *see* Attachment II to Mendi Jones's affidavit (copy of the "Judgment/Order" entered October 18, 2000), recording that Michael Washington was represented by a guardian *ad litem* ("GAL"), identified as "C. Lapidus," and that his mother appeared "pro se; waives right to attorney."[60] Further, Alabama law permitted the present plaintiffs to appeal the contested decisions of the Jefferson County juvenile court judge. If an adequate record had *not* been developed during the juvenile court hearing conducted on October 18, 2000, then plaintiffs could have appealed to the Circuit Court of Jefferson County, Alabama, for trial de novo before a different judge. *See* Alabama Code §§ 12-15-120, 12-11-30(3) (1975) (1995 Replacement Volume); *see also* Ala. R. Juvenile P. 28(B). On the other hand, if an adequate record *was* developed, then plaintiffs could have appealed directly to the Alabama Court of Civil Appeals. *See* Alabama Code § 12-12-72; *see also* Ala. R. Juvenile P. 28(A)(2)(b). *See generally* Jerome A. Hoffman, *Alabama Appellate Courts: Jurisdiction in Civil Cases*, 46 Ala. L. Rev. 843, 950-55 (1995). By either route, plaintiffs' constitutional claims were subject to further review by the Supreme Court of Alabama and, ultimately, the United States Supreme Court. It follows, therefore, that this court lacks jurisdiction over plaintiffs' claims related to false statements contained in the sworn "request for

---

[60] Defendants' motion to dismiss or, in the alternative, for summary judgment (doc. no. 12), Exhibit B (Jones's Affidavit), Attachment II.

pick-up order" and dependency petition submitted to the Jefferson County juvenile court.

**D.      Plaintiffs' Claims Against the Children's Hospital Defendants**

       To the extent that the § 1983 claims asserted in Counts VI through IX of plaintiff's original

complaint might be construed as directing claims against *all* defendants, and not just the State

defendants,[61] this court will *sua sponte* dismiss those claims against the Children's Hospital

defendants for plaintiffs' failure to comply with the heightened pleading requirement which "is the

law of this circuit" with regard to § 1983 claims against individual actors. *GJR Investments, Inc. v.

County of Escambia*, 132 F.3d 1359, 1368 (11th Cir. 1998).

> [W]hile Fed. R. Civ. P. 8 allows a plaintiff considerable leeway in framing its
> complaint, this circuit, along with others, has tightened the application of Rule 8 with
> respect to § 1983 cases in an effort to weed out nonmeritorious claims, requiring that
> a § 1983 plaintiff allege with some specificity the facts which make out [his] claim.
> Some factual detail in the pleadings is necessary to the adjudication of § 1983 claims.
> This is particularly true in cases involving qualified immunity, where we must
> determine whether a defendant's actions violated a clearly established right.

*Id.* at 1367 (citations omitted); *see also, e.g., Oladeinde v. City of Birmingham*, 963 F.2d 1481, 1485

(11th Cir. 1992) ("[W]e want to use this opportunity to repeat that, 'in an effort to eliminate

nonmeritorious claims on the pleadings and to protect public officials from protracted litigation

involving specious claims, we, and other courts, have tightened the application of Rule 8 to § 1983

cases.'") (quoting *Arnold v. Board of Education of Escambia County*, 880 F.2d 305, 309 (11th Cir.

1989)). As discussed previously, when addressing defendant Jones's qualified immunity defense,

plaintiffs have failed to "state a violation of 'clearly established statutory or constitutional rights of

---

[61] See the discussion in section II *supra*, observing that the final four counts of plaintiffs' original complaint "appear to be directed at all defendants" because of the manner in which each is framed: *i.e.*, "one or more of *all of the Defendants*, while acting in their official capacity and under of color of State law and/or pursuant to an official policy, custom and/or practice endorsed and/or approved by the City, County and/or State ...." Complaint (doc. no. 1) ¶¶ 77, 83, 90, 97 (emphasis supplied).

which a reasonable person would have known.'" *Oladeinde*, 963 F.2d at 1485 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982)).

Further, this court's jurisdiction over the state law claims asserted against the Children's Hospital defendants in the first five counts of plaintiffs' original complaint is supplemental to the federal claims. *See* 28 U.S.C. § 1367(a).[62] In cases in which the court's jurisdiction is based solely upon a federal question,[63] the district court has discretion to entertain state claims that are supplemental to the federal claim. *See* 28 U.S.C.  § 1367(a).[64] The district court may decline to exercise supplemental jurisdiction when:

> (1)    the claim raises a novel or complex issue of State law,
>
> (2)    the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
>
> (3)    the district court has dismissed all claims over which it has original jurisdiction, or

---

[62] 28 U.S.C. § 1367(a) provides that:

> (a) Except as provided in subsections (b) and (c) or as expressly provided otherwise by Federal statute, in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties.

[63] Plaintiffs were unable to rely on the court's diversity jurisdiction, for the reason that complete diversity does not exist between all of the parties.  Diversity jurisdiction exists when the suit is between citizens of different states and the amount in controversy exceeds the statutorily prescribed minimum, presently $75,000.  28 U.S.C. § 1332(a)(1).  Section 1332 requires *complete diversity* — the citizenship of every plaintiff must be diverse from the citizenship of every defendant. *See, e.g., Palmer v. Hospital Authority of Randolph County*, 22 F.3d 1559, 1564 (11th Cir.1994) (citing *Strawbridge v. Curtiss*, 3 Cranch (7 U.S.) 267, 2 L.Ed. 435 (1806)).

[64] 28 U.S.C. § 1367(a) provides that:

> (a) Except as provided in subsections (b) and (c) or as expressly provided otherwise by Federal statute, in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties.

> (4)     in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c).  As the Supreme Court has observed:

> a federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity in order to decide whether to exercise jurisdiction over a case brought in that court involving pendent state-law claims.  When the balance of these factors indicates that a case properly belongs in state court, as when the federal-law claims have dropped out of the lawsuit in its early stages and only state-law claims remain, the federal court should decline the exercise of jurisdiction by dismissing the case without prejudice.

*Carnegie-Mellon University v. Cohill*, 484 U.S. 343, 349-50, 108 S.Ct. 614, 618, 98 L.Ed.2d 720 (1988) (citing *Mine Workers v. Gibbs*, 383 U.S. 715, 726-27, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966)).  "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine — judicial economy, convenience, fairness, and comity — will point toward declining to exercise jurisdiction over the remaining state-law claims." *Carnegie-Mellon*, 484 U.S. at 350 n.7, 108 S.Ct. at 619 n.7; *see also L.A. Draper & Son V. Wheelabrator-Frye, Inc.*, 735 F.2d 414, 428 (11th Cir. 1984) (stating that "if the federal claims are dismissed prior to trial, *Gibbs* strongly encourages or even requires dismissal of state claims").

Here, plaintiffs' federal claims have been eliminated at an early stage in the litigation, prior to the commencement of discovery.  Additionally, some of the plaintiffs' state law claims against the Children's Hospital defendants raise complex and novel issues of state law, "something the courts of Alabama are in the best position to undertake and, for reasons of federalism, should undertake in this sensitive area." *Nolin v. Isbell*, 207 F.3d 1253, 1258 (11th Cir. 2000).  Therefore, the balance of factors weigh in favor of declining supplemental jurisdiction, and this court exercises

its discretion to dismiss plaintiffs' state claims against the Children's Hospital defendants.

### III. CONCLUSION

For the foregoing reasons, defendants' motions for summary judgment are due to be granted, and all claims of plaintiffs against any defendant are due to be dismissed.  An order consistent with this memorandum opinion shall be issued contemporaneously herewith.

DONE this **20**th day of May, 2002.

_____
United States District Judge